IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

| | |
|---|---|
| Tresia R. Hill, ) | |
| ) | Civil Action No. 7:13-271-BHH-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Spartanburg Regional Health Services ) | |
| District, Inc., ) | |
| ) | |
| Defendant. ) | |
| ) | |

     This matter is before the court on the defendant's motion for summary judgment (doc. 28). Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.), this magistrate judge is authorized to review all pretrial matters in employment discrimination cases and submit findings and recommendations to the district court.

     In her amended complaint (doc. 9), the plaintiff alleges causes of action for: (1) discrimination in violation of the Americans with Disabilities Act ("ADA"); (2) retaliation in violation of the ADA; (3) interference with rights in violation of the Family and Medical Leave Act ("FMLA"); (4) retaliation in violation of the FMLA; (5) race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended; and (6) violation of the South Carolina Payment of Wages Act. The defendant has moved for summary judgment on all causes of action (*see* doc. 28). In her response to the motion for summary judgment, the plaintiff does not address the defendant's arguments for dismissal of the South Carolina Payment of Wages Act claim. Accordingly, it has been abandoned, and summary judgment should be granted to the defendant on that claim. Also in her response to the motion for summary judgment, the plaintiff argues that her Title VII retaliation claim should survive summary judgment, and she makes several allegations of "racist and harassing treatment"

by the defendant (doc. 31, pl. resp. m.s.j. at 7-12, 26, 29-33).  As no Title VII retaliation or hostile work environment claims are alleged in the amended complaint,[1] the undersigned will not further address these issues as they are not properly before the court.

## FACTUAL ALLEGATIONS

The plaintiff is an African-American female who began her employment with defendant in 1996, when she was hired as a file clerk in medical records.  The plaintiff eventually held positions with the defendant as a secretary in the purchasing department and as a phlebotomist in the laboratory, prior to moving into the respiratory care department in 1998 (doc. 31-1, pl. dep. 28-29).  In her deposition, the plaintiff admits that Donna Pittman, Adult Respiratory Care Manager (Caucasian), was "involved in selecting [her] for a position in Respiratory Care" (*id.* 29).  Her job duties as a respiratory therapist included the areas of patient care, respiratory treatments, electrocardiograms ("EKGs"), and life support ventilation systems (*id.*).

The plaintiff originally worked as a full-time employee but later chose to become a PRN, which meant that she worked on an as-needed basis to fill holes in shifts not covered by full-time employees.  The plaintiff's set shift was third shift from 7:00 p.m. to 7:00 a.m. (doc. 28-4, Pittman dep. 96; doc. 28-1, pl. dep. 14, 169).  She reported directly to team leaders and supervisors assigned to her shift (doc. 28-1, pl. dep. 30; doc. 28-4, Pittman dep. 31).  The supervisors reported to Pittman, who then reported to Director Teresa O'Neal (doc. 28-1, pl. dep 30; doc. 28-4, Pittman dep. 31, 39, 81). According to the plaintiff, she reported directly to Pittman for a while during a period of light duty for an on-the-job injury in 2011 (doc. 28-1, pl. dep. 31).  The plaintiff stated that she had a professional working relationship with Pittman, that she sought advice and counsel from

---

[1]In her original complaint, the plaintiff alleged claims for hostile work environemnt and retaliation under Title VII (*see* doc. 1).  However, those claims are not alleged in her amended complaint.

Pittman when she had issues with supervisors, and that she considered her interactions with Pittman regarding time off and vacations to be positive (*id.* 31-32, 71).  The plaintiff understood that she was an at-will employee while employed by the defendant (*id.* 39).

### Health Issues

The plaintiff testified that during the course of 2010 she was diagnosed with discoid lupus (doc. 31-2, pl. dep. 238).  Lupus is an inflammatory disease that causes bodily swelling due to overactive white blood cells (doc. 31-3, pl. dep. 98).  A "flare up" of the plaintiff's lupus symptoms results in painful lesions, swelling, and skin irritations usually starting on her face, her forehead, and on the back of her neck.  These symptoms also result in bruises, skin irritation, and tearing (doc. 31-4, pl. dep. 95).

During the spring of 2010, the plaintiff began having adverse reactions to lupus medications (doc. 31-5, pl. dep. 96-97).  Due to her medical difficulties, soon after her diagnosis, the plaintiff informed Pittman that she suffered from lupus  (doc. 31- 3, pl. dep. 98).  The plaintiff's symptoms are aggravated by stress and generally occur once a month, although, on occasion, her symptoms will manifest themselves weekly and last for several months (*id.*).

In August 2011, the plaintiff was injured on the job while pushing a cart into an elevator at work.  As she was pushing the cart onto the elevator, the wheels of the cart became lodged in the doors, which caused the cart to fall over on the plaintiff breaking several ribs as a result (doc. 31-5, pl. dep. 97).  The rib injuries caused increased flare-ups of her lupus (doc. 31-3, pl. dep. 98).  In accordance with hospital policy, the plaintiff informed Pittman of her injuries (for which she received Worker's Compensation) (doc. 31-6, pl. dep. 99).

### FMLA Leave

The defendant utilizes Cigna Leave Solutions ("Cigna"), a third party administrator, to handle employee requests for FMLA leave (doc. 28-1, pl. dep. 81 & ex.

11).  Employees who wish to utilize FMLA leave are expected to call Cigna to complete an application for leave and to submit required medical certifications and documentation to support their requests (*id.,* ex. 11).  Cigna notifies the employee if information is missing or if additional information is needed to make a determination on the employee's FMLA request. (*id.* 47-48).  Cigna, not the defendant, determines whether the employee's request is approved or denied based on the information the employee submits, and Cigna notifies the employee of its determination by letter (*id.* 48, 82).  The defendant receives very limited information about the employee's FMLA request, generally an email notification advising the defendant of whether the employee's request was approved or denied or if it is pending (doc. 28-4, Pittman dep. 67, 73, 75; doc. 28-2, Bates dep. 38).  Employees can also review the status of their FMLA leave requests online through Cigna's website (doc. 28-1, pl. dep. 48).  Cigna is not aware of the requesting employee's race because communications between the employee and Cigna are not done in-person (*see id.* 48, 82).

On June 8, 2010, Cigna approved the plaintiff's request for intermittent FMLA leave from May 24 to November 19, 2010, due to a knee injury (doc. 28-1, pl. dep. 105 & ex. 17).  The plaintiff concedes that she received and used FMLA leave with no issues, that she understood the procedures for obtaining FMLA leave (including required submission of medical certifications), and that she understood how to tell if her FMLA request was approved or denied (*id.* 83, 108).  The plaintiff also understood that she was responsible for notifying a supervisor as early as possible of any absence or tardy and for following the departmental call-in policies (*i.e.*, calling at least two hours prior to the shift) (*id.* 85-86 & ex. 12).

On March 16, 2011, Cigna sent a letter to the plaintiff notifying her that she was "eligible" for intermittent FMLA leave from March 16 to September 19, 2011, but that "a final determination will be based on the medical information or supporting documentation provided by the employee" (doc. 28-1, pl. dep. ex. 18).  The plaintiff understood that

4

"eligible" did not mean that her request had been approved (*id.* 108-09).  On April 1, 2011, Cigna denied the plaintiff's request for intermittent FMLA leave from March 16 to September 19, 2011, because she did not return the required medical certification (*id.*, ex. 19).  On April 13, 2011, Cigna denied the plaintiff's request for intermittent FMLA leave from November 20, 2010, to May 19, 2011 because she again failed to return the medical certification (*id.,* ex. 20).  On August 11, 2011, Cigna denied the plaintiff's request for intermittent FMLA leave from June 24, 2011, to December 23, 2011, because her medical certification was incomplete (*id.*, ex. 22-23).  On October 13, 2011, Cigna notified the plaintiff that her request for intermittent FMLA leave had been approved for the period of June 24 to July 22, 2011, and for the period of October 13 to December 23, 2011 (*id.*, ex. 23).  The letter further stated that Cigna had denied the plaintiff's request for intermittent FMLA leave for the intervening period of July 23 to October 12, 2011 because her medical certification was incomplete (*id.*).

***Attendance***

The plaintiff testified that she was familiar with the defendant's Attendance/Tardiness Policy.  She also understood that, in order for an absence or tardy to be excused as FMLA leave, she would have to receive an approval from Cigna for the requested leave (doc. 28-1, pl. dep. 78-79).  Otherwise, the absence or tardy would be considered an occurrence and subject her to disciplinary action up to and including termination (*id.* 79 & ex. 10, def. attendance/tardiness policy stmt.).  The plaintiff also admitted that the defendant did not issue her any disciplinary actions for tardies or absences involving dates for which she had approved FMLA leave (*id.* 145, 197).

When there are attendance issues, the supervisor provides the dates of the tardies/absences to Pittman, who verifies the attendance issues using Kronos, which is the system employees use to clock in and out for work (doc. 28-4, Pittman dep. 51, 82, 95).  Pittman checks for any FMLA notifications from Cigna to make sure that the employee has

no approved FMLA for the dates in question (*id.* 82-83, 94-95, 98). She also checks to make sure the tardies are not dates for which the employee was called-in to cover for another employee (*id.* 100).  Pittman consults Antoinette "Audee" Bates, Employee Relations Manager, who is African-American and has lupus, on the disciplinary action and also makes sure that the Director O'Neal (Caucasian) is in agreement on the disciplinary action (*id.* 82, 84, 93-94; doc. 28-2, Bates dep. 30, 51).  The supervisor and/or Pittman then meets with the employee to issue the disciplinary action (doc. 28-4, Pittman dep. 82). Normal procedure is to have a witness, who is in a leadership position, present during the disciplinary meeting with the employee (*id.* 110). The identity of the witness to the disciplinary action depends on which leadership member is available at the time, because Pittman and the supervisors try to issue the corrective action as close in time as possible to the infraction in order to prevent further issues (*id.* 97).

Prior to the plaintiff's health issues and FMLA requests, the plaintiff's personnel file reflects that on February 10, 2009, she received a verbal warning for attendance issues (doc. 28-1, pl. dep. ex. 27).  On March 25, 2009, the plaintiff received a written warning for being tardy for work a total of 20 occurrences (*id.*).  On December 4, 2009, the plaintiff received a written warning for numerous tardies and four absences (*id.* ex. 28).  The plaintiff testified that the signature on that warning "looks like" hers (doc. 28-1, pl. dep. 132). On March 15, 2010, the plaintiff received a written warning for having 18 tardies in the previous 12 months (*id.* ex. 29).  The plaintiff testified in her deposition that the signature on the March 15, 2010, written warning is not her signature (doc. 31-30, pl. dep. 133).    On May 17, 2010, the plaintiff received a written warning for six no shows and/or absences (doc. 28-1, pl. dep. ex. 30).

On June 6, 2011, Sonia McFalls (Third Shift Supervisor) issued a verbal warning to the plaintiff for failing to timely obtain her Respiratory Care Practitioner license, which caused McFalls to place the plaintiff on a leave of absence until she obtained the

required license (doc. 28-5, McFalls decl. ¶ 3; doc. 28-3, disciplinary actions, Bates # 0393). On August 6, 2011, the plaintiff did not clock into work and failed to chart any of her work for the entire shift (doc. 28-5, McFalls decl. ¶ 5). On August 9, 2011, McFalls and Pittman addressed the documentation issues with the plaintiff and McFalls stressed the importance of proper documentation (*id.*). On August 15, 2011, McFalls issued a written warning to the plaintiff because she failed to show up to work her scheduled shift on August 3, 2011; she was not available on her scheduled "call" day on August 9, 2011; and she failed to complete documentation during the shift directly following her counseling about documentation issues (doc. 28-5, McFalls decl. ¶ 5; doc. 28-1, pl. dep. ex. 31). The plaintiff testified in her deposition that the signature on the August 15, 2011, written warning is not her signature and that she does not remember receiving this written warning (doc. 31-31, pl. dep. 138). The plaintiff had no approved FMLA leave for any of the dates in question (doc. 28-1, pl. dep. 139).

The plaintiff alleges that some time around September 20, 2011, she complained to Bates that Pittman was writing her up for attendance. The plaintiff testified she asked Bates what she could do to show Pittman that the attendance issues were not her fault (doc. 28-1, pl. dep. 46-47, 243, 245). The plaintiff allegedly told Bates that Senior Team Leader Lynn Costello (Caucasian) received FMLA without an issue and that the plaintiff could not understand why she was getting written up (*id.* 243, 262). The plaintiff was not privy to any of Costello's FMLA requests or medical certifications or any disciplinary actions she did nor did not receive (*id.* 207-208).

On September 30, 2011, Pittman issued a written warning to the plaintiff for being tardy to work ten times in September 2011. The plaintiff had no approved FMLA leave for any of the dates she was late (doc. 28-1, pl. dep. 140 & ex. 32). The written warning clearly stated that "any additional incidents or violations may result in additional actions including suspension or termination" (*id.*). The plaintiff was tardy again on October 4, 2011,

and received a two-day suspension as a result (*id.* ex. 33).  During the suspension meeting, the plaintiff claimed that she had applied for FMLA, and Pittman told her that, if the FMLA was later approved, Pittman would pay her for the days she was suspended.(doc. 28-4, Pittman dep. 98; doc. 28-1, pl. dep. 144).  However, Cigna ultimately denied the plaintiff's FMLA request due to her incomplete medical certification (doc. 28-1, pl. dep. 141,143 & ex. 23).  The plaintiff had no approved FMLA for any of the 11 tardies that resulted in her suspension, and she did no work while she was suspended (*id.* 141, 144).

Pittman met with the plaintiff in October 2011 to terminate her employment because of tardies (doc. 28-1, pl. dep. 246-47).  At the meeting, the plaintiff claimed to have an approved FMLA leave (doc. 28-4, Pittman dep. 101-02).  Pittman told the plaintiff that she would go back through the file to make sure she had not missed an approval notice from Cigna (*id.*).  Pittman came across an FMLA notice from Cigna that said "eligible" and mistakenly construed that as an approval (*id.* 101).  Pittman then excused 13 of Hill's tardies and told her to go back to work (doc. 28-4, Pittman dep. 101-02).  When Pittman notified Bates, Bates reminded Pittman that "eligible" did not mean "approved."  Pittman then pulled up the next record, which clarified that the plaintiff's FMLA request was still pending (doc. 28-4, Pittman dep. 102).  Pittman still excused the 13 tardies even though the plaintiff had no FMLA for those dates, and the plaintiff's request for FMLA leave was ultimately denied for incomplete certification (doc. 28-4, Pittman dep. 102; doc. 28-1, pl. dep. ex. 23).

In October or November 2011, Senior Team Leader Costello served as a witness to one of the plaintiff's disciplinary actions for tardies as she was the only member of the leadership available at the time and she had management experience (doc. 28-4, Pittman dep. 110-11; doc. 31-19, pl. dep. 250).  According to Pittman, "many times" she had a team leader sit with her during a disciplinary meeting with an employee (doc. 28-4, Pittman dep. 112).  The plaintiff claims that Costello's presence in the meeting violated her

8

"personal and confidentiality" as Costello was not a manager (doc. 31-19, pl. dep. 250). The plaintiff further claims that this was race discrimination: "being two white females in the room and me a black female" (*id.*). The plaintiff does not dispute that she had no approved FMLA leave for the absences and tardies addressed during that disciplinary meeting (doc. 28-1, pl. dep. 145, 197).

In October 2011, Third Shift Supervisor McFalls conducted the plaintiff's performance appraisal (doc. 28-1, pl. dep. 148-49 & ex. 35; doc. 28-5, McFalls decl. ¶ 6). The plaintiff received an overall score of 1.95, indicating that she needed improvement, particularly with regard to documentation and arriving to work on time (doc. 28-1, pl. dep. ex. 35). The plaintiff testified that she and McFalls went over half of the evaluation (doc. 31-33, pl. dep. 149). When she questioned McFalls about some of the scores she was given and questioned who actually did the evaluation, the plaintiff claims McFalls told her that Pittman did the evaluation (*id.*). The plaintiff claims McFalls then stopped going over the evaluation and told the plaintiff that she would have to talk to Pittman about it (*id.*).

On or about October 11, 2011, after the plaintiff had an unapproved absence on October 10, 2011, and an unapproved tardy on October 11, 2011, with no approved FMLA leave, Bates and Pittman met with the plaintiff to terminate her employment for attendance issues (doc. 28-2. Bates dep. 40; doc. 28-4, Pittman dep. 68-69; doc. 28-6, termination notice). The plaintiff appeared for the meeting and immediately asked to contact Neil Matthews, the Cigna Claims Manager, regarding the status of her leave request (doc. 28-4, Pittman dep. 68-69, 71-73, 76). Matthews stated that he had just received the plaintiff's paperwork, that it looked favorable upon first glance, but that he would have to review the information before making a final determination (doc. 28-2, Bates dep. 39, 41; doc. 28-4, Pittman dep.76). According to the plaintiff, Matthews said it was his fault, that he had been on vacation, and that the paperwork was on his desk (doc. 28-1, pl. dep. 205, 254). Pittman gave the plaintiff the benefit of the doubt and did not proceed with her

9

termination (doc. 28-4, Pittman dep. 57-58).  Pittman also excused the plaintiff's absence and tardy on October 10-11, 2011, even though Cigna ultimately denied her request for leave during that period because of an incomplete certification (doc. 28-4, Pittman dep. 57-58; doc. 28-1, pl. dep. ex. 23).

As evidence of Pittman's harassment of her due to her race, medical condition, and attempts to exercise her FMLA rights, the plaintiff notes that, during her meeting with Pittman and Bates, her hands were swollen due to lupus, but Pittman nonetheless sent her back to work (doc. 31-24, Pittman dep. 77) "with no compassion or consideration" (doc. 31, pl. resp. m.s.j. at 11)

The plaintiff alleges that, following this meeting, Pittman told her on the elevator that, if she had not heard from Matthews regarding her FMLA request, the plaintiff's "butt would have been fired" (doc. 28-1, pl. dep. 55, 254). The plaintiff does not allege that Pittman made any racial comments to her during this conversation or at any other time, and the plaintiff does not allege that she reported Pittman's comment to anyone (doc. 28-1, pl. dep. 56; *see also* doc. 28-2, Bates dep. 49).   The plaintiff claims this comment was "additional retaliation for her having complained of race discrimination to Bates during late September 2011" (doc. 31, pl. resp. m.s.j. at 11).

***Work Issues***

On June 3, 2010, Supervisor Dale Chambers (Caucasian) counseled the plaintiff because she set up a ventilator for an adult patient using the infant mode instead of adult mode (doc. 28-3, disciplinary actions, Bates #0394).  Chambers also questioned the plaintiff about her disappearance from the Emergency Room ("ER") that day where she was assigned to work.  The ER charge nurse, all the other charge nurses, and at least three other people could not find the plaintiff during her shift despite an exhaustive search. Based on these issues, Chambers removed the plaintiff from the Critical Care Arena (*id.*; doc. 28-4, Pittman dep. 109).

10

McFalls testified that she also had ongoing issues with the plaintiff failing to timely respond to pages and being behind on her work because she arrived late and then socialized before getting started (doc. 28-5, McFalls decl. ¶ 2). McFalls regularly found the plaintiff chatting with a secretary in the Medical Intensive Care Unit ("MICU") instead of performing her job duties (*id.* ¶ 11). Respiratory therapist Anna Jackson (Caucasian) had the same issues with the plaintiff (doc. 28-7, Jackson decl. ¶ 4). Jackson often witnessed the plaintiff spending time in the break room when she was supposed to be working, and she was directly affected by the plaintiff not starting her work on time because Jackson and others had to pick up the plaintiff's slack (*id.*).

Beginning in August 2011, the plaintiff was assigned to the Pulmonary Gas Lab while on light duty for her on-the-job injury until she was released to full duty on November 3, 2011 (doc. 28-8, Buchanan decl. ¶ 2; doc. 28-1, pl. dep. ex. 14-16). In the lab, the plaintiff worked with respiratory therapist Sherry Buchanan (Caucasian), who had numerous issues with the plaintiff taking inappropriately long breaks and disappearing to the break room when she was supposed to be working (doc. 28-8, Buchanan decl. ¶ 2). For example, on the very first day of the plaintiff's light duty assignment, she arrived at work, told Buchanan that she was going to breakfast instead of beginning her job duties, and disappeared to the break room for an hour and a half. Buchanan found the plaintiff sitting in the break room reading a magazine (*id.* ¶ 3). The plaintiff regularly stayed in the break room for an hour or longer after Buchanan, who went on break at the same time as the plaintiff, had finished her own meal and returned to work in the lab (*id.* ¶ 4). Buchanan often had to go looking for the plaintiff because she was not where she was supposed to be, and Buchanan usually found her in the break room (*id.*).

### Termination

On November 25, 2011, the plaintiff was assigned to work third shift, which began at 7:00 p.m. on November 25, 2011, and ended at 7:00 a.m. on November 26, 2011

11

(doc. 28-1, pl. dep. 169; doc. 28-9, Davella decl. ¶ 1). Her charge therapist and team leader that night was April Davella (Caucasian). Earlier in the shift, nurses complained to Davella that the plaintiff was not responding to their pages for treatments. The plaintiff created documentation that she was performing treatments, but Davella confirmed with the nurses and patients that the plaintiff had not performed the treatments and Davella then performed the treatments herself (doc. 28-9, Davella decl. ¶ 3). Around 11:00 p.m., Davella paged the plaintiff via the overheard speaker system, because the plaintiff was not answering pages sent to her work pager. The plaintiff responded and said the batteries in her pager had died (doc. 28-9, Davella decl. ¶ 3; doc. 28-1, pl. dep. 171-72). The plaintiff admitted in her deposition that she was expected to answer pages immediately (doc. 28-1 pl. dep. 173). The plaintiff also conceded that she was expected to make sure her equipment (including her pager batteries) was functional, because failure to do so could result in delays in patient treatment as well as disciplinary action (*id.* 171-72).

At 2:14 a.m. a physician ordered a STAT EKG for a patient on 6 Tower, an area for which the plaintiff was the assigned respiratory therapist that night (doc. 28-16, Woodleaf decl. ¶ 2; doc. 28-17, Martinez decl. ¶ 3; doc. 28-9, Davella decl. ¶ 5; doc. 28-10, ex. J, EKG Order). STAT EKGs are considered emergencies and must be completed within ten minutes of the order (doc. 28-16, Woodleaf decl. ¶ 2; doc. 28-17, Martinez decl. ¶ 4; doc. 28-9, Davella decl. ¶ 5; doc. 28-1, pl. dep. 69-71 &. ex. 8). Failure to complete a STAT EKG within ten minutes is grounds for disciplinary action up to and including termination (doc. 28-1, pl. dep. 70). When the assigned respiratory therapist is paged for a STAT EKG, it is the respiratory therapist's duty to respond within ten minutes or notify the charge person that they are unavailable (doc. 28-11, Jackson dep. 45-47).

Registered nurse Mary Alex Woodleaf (Caucasian) immediately paged the plaintiff to perform the STAT EKG, and the plaintiff responded that she would "be right there" (doc. 28-16, Woodleaf decl. ¶ 3). However, 30 minutes passed, and the plaintiff did

not show up to perform the STAT EKG (*id.* ¶ 4). Woodleaf then notified the charge nurse, Rose Martinez (Filipino), that the plaintiff had not come to perform the STAT EKG (*id.*; doc. 28-17, Martinez decl. ¶ 3). Both Woodleaf and Martinez paged the plaintiff (doc. 28-16, Woodleaf decl. ¶ 4; doc. 28-17, Martinez decl. ¶ 5). The plaintiff responded to Woodleaf's second page and said that she was on her way (doc. 28-16, Woodleaf decl. ¶ 4).

Meanwhile, around 2:30 or 2:45 a.m., Davella received a call from Anna Jackson, who was assigned to the MICU (doc. 28-9, Davella decl. ¶ 4). Jackson reported that the plaintiff, who was not assigned to that area, was socializing with a secretary in the MICU instead of doing her job duties and that it had been going on for over an hour (*id.*). In the resulting investigation, Jackson confirmed that the plaintiff was sitting in the MICU break room near the nurses' station from 1:30 a.m. to 3:24 a.m., despite the fact that she was supposed to be doing treatments. Jackson heard the plaintiff receiving pages during that time (doc. 28-7, Jackson decl. ¶ 3).

Around 3:15 a.m., Martinez paged Davella and reported that Woodleaf had spoken with the plaintiff twice and that the plaintiff still had not shown up to perform the STAT EKG for over an hour (doc. 28-9, Davella decl. ¶ 5). Davella then paged the plaintiff and told her that she needed to go to 6 Tower to perform the STAT EKG. The plaintiff responded, "I know" (*id.* ¶ 6). According to the EKG machine (nicknamed "Goliath"), the plaintiff performed the STAT EKG at 3:36 a.m. on November 26, 2011 – approximately an hour and 22 minutes after the physician ordered it (*id.* ¶¶ 6-7; doc. 28-16, Woodleaf decl. ¶ 6; doc. 28-1, pl. dep. ex. 37; doc. 28-10, ex. J, STAT EKG Order). The plaintiff then failed to batch the EKG (*i.e.*, send it to the EKG Department for a physician's review and diagnosis), which is a serious violation and grounds for disciplinary action, including discharge (doc. 28-1, pl. dep. 65-66, 176-77 & ex. 6, 37).

Thereafter, Davella spoke to Martinez and Woodleaf who confirmed that they repeatedly paged the plaintiff for the STAT EKG, that the plaintiff kept indicating that she

was on her way, and that the plaintiff did not arrive to perform the STAT EKG for more than an hour (doc. 28-9, Davella decl. ¶ 7). Davella also audited the plaintiff's documentation from that night and discovered that she was falsely charting treatments (which Davella actually performed) during times when Davella and others saw the plaintiff elsewhere (*id.* ¶ 8). For example, Davella's audit revealed that the plaintiff charted that she performed a Hand-Held Nebulizer ("HHN") treatment on a patient at 21:36 on November 25, 2011, in Room 404 (doc. 33-3, Davella decl. II ¶ 5).[2] However, Davella was paged to perform that treatment because the plaintiff never showed up to perform it. Before performing the HHN treatment herself at 22:20, Davella confirmed with both the patient and the nurse that the plaintiff had failed to perform the treatment (*id.*).

Davella reported all of these issues to Pittman, who started an investigation of her own (doc. 28-9, Davella decl. ¶ 9; doc. 28-4, Pittman dep. 124-27). Pittman spoke with Davella, Martinez, Jackson, and Woodleaf, all of whom confirmed the events of that night as set forth above. (doc. 28-4, Pittman dep. 127-28). Pittman also confirmed that the EKG was processed by Goliath at 3:36 a.m. on November 26, 2011. Pittman contacted BioMed and confirmed that there were no reports of problems (including any issues with the time reading) on Goliath (*id.* 128-29; doc. 28-1 pl. dep. ex. 37). Pittman reported her findings to Director O'Neal and to Bates (doc. 28-4, Pittman dep. 126; doc. 28-2, Bates dep. 43). The Director, the Supervisor, the Team Leader, and Human Resources (including Bates) recommended that the plaintiff be terminated for poor work performance, which she was on November 30, 2011 (doc. 28-4, Pittman dep 126-27; doc. 28-2, Bates dep. 43-44, 46; doc. 31-39, disciplinary action form). The disciplinary action form for the plaintiff's termination states that the plaintiff "was paged several times and unable to be reached. A

---

[2]Davella's second declaration, which was submitted in support of the defendant's reply, sets forth numerous instances of the plaintiff's failure to perform her assigned treatments as found in Davella's audit of the plaintiff's documentation for the shift on November 25-26, 2011 (*see* doc. 33-3, Davella decl. & attachments).

'stat' EKG was not performed for 1 hour and 15 minutes.  The charge therapist was called for a treatment which was charted had already been performed. [The plaintiff] was observed sitting at a nursing station while treatments were documented as being performed. . . ." (doc. 31-39, disciplinary action form).

The plaintiff testified in her deposition that she found out that the STAT EKG was needed when Martinez, the charge nurse, spoke with her face-to-face and told her that she needed the EKG to be done (doc. 28-1, pl. dep. 169).  However, Martinez testified in her declaration that, as described above, she paged the plaintiff after she was told by Nurse Woodleaf that 30 minutes had passed since the plaintiff told Woodleaf she would be "right there" to perform the EKG.   According to Martinez, she did not see the plaintiff during her shift, and she did not have any face-to-face discussion with her about the STAT EKG ordered for Woodleaf's patient (doc. 28-17, Martinez decl. ¶¶ 5-6).

The plaintiff alleges that she performed the STAT EKG immediately and that the time on Goliath was incorrectly reading one hour behind the correct time when she performed the STAT EKG (doc. 28-1, pl. dep. 169-70, 186).  However, part of the plaintiff's job duties was to verify that the date and the time on the EKG machine were correct whenever she performed an EKG (*id.* 64, 68-69, 184-85 & ex. 6-7).  The plaintiff conceded in her deposition that failure to verify the date and time was grounds for disciplinary action (*id.* 64, 68-69, 185).  In her deposition, the plaintiff ultimately conceded that she did not notice any issues with the time when she performed the EKG (*id.* 198-99, 230-31).[3]  The

---

[3]  In paragraph 24 of the amended complaint, the plaintiff states that, at the time she performed the EKG, "Plaintiff did not know that the EKG machine she used known as 'Goliath' was reading as an hour behind the normal time" (doc. 9, amend. comp. ¶ 24). However, the plaintiff initially claimed in her deposition that she noticed the time issue when she performed the EKG and that she notified another respiratory therapist, Paula Townes (African-American) (doc. 28-1, pl. dep. 182, 186-87). After being reminded of the allegations in her amended complaint, the plaintiff conceded that she was not aware of any time issue until after her termination at least four days after she did the EKG (*id.* 198-99, 230-31 & ex. 37-38).  The plaintiff claimed that Townes told her that there was an issue with Goliath's time and said that supervisor Tina Rogers was aware of it (*id.* 199, 231). The plaintiff

very next usage of Goliath was another EKG performed by the plaintiff the following day, and she still did not notice or report any issues with the time on the machine (doc. 28-13, Rogers decl. ¶ 3; doc. 28-14, Smith decl. ¶3; doc. 28-1, pl. dep. ex. 37; doc. 28-12, ex. EKGs by Hill and Rogers; *see also* doc. 28-1, pl. dep 198-99, 230-31).

The next person to use Goliath was Tina Rogers, A.M. Shift Supervisor (Caucasian), who performed an EKG immediately after the two performed by the plaintiff (doc. 28-14, Smith decl. ¶ 3; doc. 28-13, Rogers decl. ¶ 3).  The date and time on Goliath were correct when Rogers performed the EKG (*id*.).  The machine is not self-correcting, and the plaintiff admits that she did not correct the time on the machine (doc. 28-1, pl. dep. 182, 198-99, 230-31).

The EKG machine does not simply run fast or slow with regard to time.  If the time is off, then it means that either someone manually entered an incorrect time in the machine or the machine was left unplugged for an extended period and the battery drained. When the battery drains, the date on the machine automatically reverts back to 1995 and a warning screen appears notifying the user that the date and time are incorrect.  Rogers and Tammy Smith, the Manager of Diagnostics, have never seen or received reports of only the time being incorrect.  Any issues involved both the date and the time being incorrect time (doc. 28-14, Smith decl. ¶ 2; doc. 28-13, Rogers decl. ¶ 2). The reports for the EKGs performed by the plaintiff and by Rogers (immediately following the plaintiff) all show that the year was correctly reading 2011, and not 1995 (doc. 28-1, pl. dep. ex. 37; doc. 28-12, ex. L, EKGs by pl. and Rogers).

―――――――――――――――

claimed that she spoke to Townes about Goliath's "malfunction" after her termination (*id.* 199). Townes does not recall any such conversation and has not seen or spoken with the plaintiff since her termination (doc. 28-15, Townes dep. 41-42).  Townes further testified that she would have reported a time issue to Tammy Smith, the Manager of Diagnostics, not Rogers (*id.* 32-33, 38).  Neither Smith nor Rogers received any such reports from Townes, the plaintiff, or anyone else (doc. 28-14, Smith decl. ¶ 3; doc. 28-13, Rogers decl. ¶ 3).

The plaintiff stated in her deposition that she did not perform the STAT EKG until approximately 4:00 a.m. on November 26, 2011 (doc 28-1, pl. dep. 186).  Even if the machine were an hour behind as the plaintiff claims, this would mean the plaintiff did not perform the STAT EKG until 4:36 a.m., which would have been a lengthier delay (*see* doc. 28-1, pl. dep 186 & ex. 37; doc. 28-10, ex. J, STAT EKG Order).

***Allegedly Racial Remarks***

To support her race discrimination claim, the plaintiff points to a remark Pittman allegedly made to employee Anita Y. Jackson (African-American) outside the plaintiff's  presence approximately eleven years prior to the plaintiff's termination (doc. 31, pl. resp. m.s.j. at 12). Anita Jackson (not to be confused with Anna Jackson) testified that, sometime prior to 2000, she was a new employee and that she raised her voice in a meeting with Pittman over a new scheduling system (doc. 28-11, Jackson dep. 29, 32). During this confrontation, she stated that Pittman told her, "Shut your damn black mouth or I'll send you home for insubordination" (*id.* 26, 32, 56). Jackson did not consider this a racially charged comment and testified that she knew the procedures for reporting harassment or discrimination, that she would have reported the comment if she had felt harassed or discriminated against, and that she did not report the comment (*id.* 33, 35, 50-52).  Jackson further testified that Pittman (who denies the remark) never made any racial remarks in her presence (*id.* 25-26). Jackson also described Pittman as a fair, compassionate manager who promoted her, groomed her for another promotion, and is fair with regard to disciplinary actions and investigations (*id.* 55-57). Jackson described Pittman as "compassionate and she go to bat for you sometimes and like, if somebody report you or something, she'd do an investigation and not just take their word for it" (*id.* 55). Jackson stated that she would not describe Pittman as someone who discriminates against employees because of their race or disability (*id.* 57).

17

The plaintiff also contends that it was "offensive" for April Davella, the team leader who reported the plaintiff's STAT EKG issue to Pittman, to use the word "black" when describing an African-American patient (doc. 31, pl. resp. m.s.j. at 19 (citing doc. 31-43, pl. dep. 159)).

## APPLICABLE LAW AND ANALYSIS

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the

18

outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### Title VII

The plaintiff alleges the defendant discriminated against her by terminating her employment because of her race in violation of Title VII.  Absent direct evidence of intentional discrimination, Title VII claims are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973). Title VII prohibits an employer from "fail[ing] or refus[ing] to hire or . . . discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e–2(a). To establish a *prima facie* case of discrimination, a plaintiff must prove that:  (1)  she was in a protected class; (2)  she was performing her job in a satisfactory manner; (3)  the employer took an adverse action against her; and (4)  the alleged adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination.  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir.2004) (en banc). If the plaintiff can establish a *prima facie* case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions against the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-55 (1981) (this is a burden of production, not persuasion).  If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

The undersigned agrees with the defendant that the plaintiff cannot show that she was performing her job in a satisfactory manner nor can she show that she was terminated from employment under circumstances that raise a reasonable inference of unlawful discrimination.  Moreover, she cannot show that the reason given for her

19

termination from employment was pretext for race discrimination. Accordingly, summary judgment should be granted on this claim.

First, the evidence set forth above, when viewed in a light most favorable to the plaintiff, nonetheless shows a long history of attendance and tardiness issues and other job performance issues, as well as a well-documented, thorough investigation into the plaintiff's failure to respond to a STAT EKG for over an hour. The plaintiff's assertion that she did not have any attendance issues until after she complained to Bates in September 2011 (doc. 31, pl. resp. m.s.j. at 5), regarding a white employee (Costello) allegedly receiving more favorable treatment with regard to FMLA leave, is simply not borne out by the evidence. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (finding the plaintiff's "own testimony . . . cannot establish a genuine issue as to whether [he] was meeting [his employer's] expectations") (citing *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir.1996) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.")).

The plaintiff contends that she can establish the fourth element of her *prima facie* case because Dave Hamblen, a white male respiratory therapist, failed to perform a STAT EKG during 2011 but was not disciplined or terminated by Pittman (doc. 31, pl. resp. m.s.j. at 21). The plaintiff stated in her deposition that it was her "understanding" that Hamblen "at some point in time, failed to perform a STAT EKG" (doc. 31-39, pl. dep. 235-36)). However, the plaintiff does not allege that she ever reported such an issue involving Hamblen or anyone else to Pittman (doc. 28-1, pl. dep. 179-81). Sonia McFalls, the Third Shift Supervisor in Adult Respiratory Care, testified in her affidavit that she is unaware of Hamblen or any other respiratory therapist, besides the plaintiff, failing to perform a STAT EKG within the ten minutes required by policy (doc. 28-5, McFalls decl. ¶ 9). It is undisputed that Pittman terminated Hamblem for work performance issues in 2013 after the plaintiff was terminated from employment (doc. 284, Pittman dep. 160).

20

The plaintiff further claims that several Caucasian employees violated the defendant's Red Rule Policy regarding blood analysis, but Pittman did not terminate those employees from employment (doc. 31, pl. resp. m.s.j. at 22).  However, it is undisputed that: (1) the plaintiff was never disciplined for any Red Rule violations; (2) the Red Rule policy is separate and apart from other disciplinary policies; (3) the plaintiff never reported such issues to Pittman and has no personal knowledge of whether anyone else did; (4) the only personal knowledge the plaintiff had about Red Rule disciplinary actions was that the individuals were still employed; and (5) multiple witness have confirmed that the individuals were held accountable for any issues in accordance with the defendant's policies (doc. 31-51, pl. dep.  208-09; doc. 28-4, Pittman dep. 156, 160-61; doc. 28-5, McFalls decl. ¶ 10; doc. 28-8, Buchanan decl. ¶¶ 6-8; doc. 28-14, Smith decl. ¶¶ 5-6).   The plaintiff contends that Tammy Smith, the Manager of Diagnostics, which includes EKG, the Blood Gas Lab, and pulmonary functions, stated in her declaration that disciplinary actions only remain on an employee's record for a year, after which they no longer factor in to the defendant's progressive disciplinary procedure (doc. 31, pl. resp. m.s.j. at 25).   However,  Smith's testimony in the declaration was that Red Rule violations are "separate and apart from disciplinary actions for other types of work performance issues," and there is a progression of discipline for such violations in a rolling one year period  (doc. 28-14, Smith ¶ 5).

As set forth above, the plaintiff's personnel records and witness testimony show numerous verbal and written warnings and a suspension before she was ultimately terminated.  The plaintiff has failed to identify any employee outside her protected class who received more favorable treatment after engaging in conduct of comparable seriousness to her own conduct.

In support of her race discrimination claim, the plaintiff contends that "Pittman had a history of making racially discriminatory remarks toward African American workers under her supervision which dates back to the year 2000" (doc. 31, pl. resp. m.s.j. at 12).

Despite using the plural "remarks," the plaintiff points to one remark Pittman allegedly made to a an African-American employee outside the plaintiff's presence at least eleven years prior to the plaintiff's termination. As set forth above, Pittman told Anita Jackson, "Shut your damn black mouth or I'll send you home for insubordination (doc. 28-7, Jackson dep. 26, 32, 56). However, Jackson testified that she did not consider this a racially charged comment, that she knew the procedures for reporting harassment or discrimination, that she would have reported the comment if she had felt harassed or discriminated against, and that she did not report the comment (*id.* 33, 35, 50-52). Viewing the evidence in a light most favorable to the plaintiff, any such remark made by Pittman was a stray or isolated remark unrelated to the employment decision in question. Accordingly, it is not indicative of discrimination. *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999); *see also Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511-12 (4th Cir. 1994) (finding that a statement made over two years prior to plaintiffs' terminations was too remote in time to show age discrimination).

The plaintiff also argues in her response to the motion for summary judgment that it was "offensive" for April Davella, the respiratory therapist team leader who reported the plaintiff's STAT EKG issue to Pittman, to use the word "black" when describing an African-American patient (doc. 31, pl. resp. m.s.j. at 19 (citing doc. 31-43, pl. dep. 159)). The undersigned agrees with the defendant that such an allegation is absurd. The plaintiff's own counsel in the memorandum in opposition to the motion for summary judgment identifies witnesses with the abbreviation "BF," which presumably indicates "black female" (*see* doc. 31, pl. resp. m.s.j. at 12, 20). Moreover, the plaintiff referred to herself in her deposition as a "black female" (doc. 31-19, pl. dep. 250).

Equally untenable is the plaintiff's allegation of racism in that "Pittman would often bring other Caucasian employees in as spectators during these harassment sessions, despite the fact that these employees were not Management Personnel" (doc. 31, pl. resp.

22

m.s.j. at 9).  Despite claiming Pittman would "often" engage in such conduct, the plaintiff points to one meeting regarding a disciplinary action when Pittman asked Senior Team Leader Costello, a Caucasian, to serve as a witness.  When asked by her attorney whether she contended that it was race discrimination for Costello to be present in her disciplinary meeting for attendance issues the plaintiff stated, "Yes, being two white females in the room and me a black female" (doc. 31-19, pl. dep. 250).  However, it is undisputed that Pittman consistently ensured that a witness from the leadership team was present during any disciplinary actions, and she "many times" had a team leader sit with her (doc. 28-4, Pittman dep. 112).

Even if the plaintiff could establish a *prima facie* case of race discrimination, the defendant has a offered legitimate reason for the plaintiff's discipline and termination: her failure to perform a STAT EKG for over an hour.  Accordingly, she must show that the stated reasons were a pretext for race discrimination.  The plaintiff has failed to make such a showing.

The plaintiff disputes alleged attendance issues and the thoroughness of the defendant's investigation of her failure to timely perform the STAT EKG.  However, as the Fourth Circuit Court of Appeals stated in *Bonds v. Levitt*, 629 F.3d 369, 386 (4th Cir. 2011) "Even if . . . investigations [against the plaintiff] were improper or substandard, that does little to help her establish that the reasons given for her termination were not the actual reasons, and it certainly does not give rise to a reasonable inference that her race . . . was the real reason for her termination."  Here, the evidence shows that the defendant terminated the employment of the plaintiff, who already had a lengthy disciplinary history, for failing to perform a STAT EKG for over an hour and for various documentation issues.  The plaintiff's termination occurred only after a thorough investigation involving multiple witnesses and records.  The plaintiff's mere disagreement with the methods and outcome of the defendant's investigation into the misconduct resulting in her termination is

insufficient to survive summary judgment. *See, e.g., Mercer v. Arc of Prince Georges County, Inc.*, 532 F. App'x 392, 399 (4th Cir. 2013) (stating plaintiff's affidavit "does no more than demonstrate the unexceptional fact that she disagrees with the outcome of [her employer's] investigation. It does not prove [the employer's] investigation or proffered reason for deciding to terminate her employment was not the real reason for its action.") (internal quotations and citations omitted). *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989) ("A plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action.").

The evidence in this case overwhelmingly shows that the plaintiff was terminated from employment because of her unsatisfactory performance. The plaintiff has failed to present evidence upon which a reasonable factfinder could determine that she was terminated from employment because of her race. Based upon the foregoing, summary judgment should be granted on the plaintiff's Title VII race discrimination claim.

### ADA

The plaintiff alleges that the defendant violated the ADA by terminating her employment based on her disability and in retaliation for her complaints. The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The *McDonnell Douglas* scheme of proof applies to claims under the ADA. *Ennis v. National Ass'n of Business and Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995). Accordingly,

> [T]he plaintiff has the initial burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. If the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. If the defendant meets this burden of production, the presumption created by the *prima*

24

> facie case "drops out of the picture," and the plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination.

*Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).

To establish a *prima facie* claim of disability discrimination under the ADA, the plaintiff must prove (1) she had a disability as defined by the ADA; (2) she was a "'qualified individual,'" i.e., able to perform the essential functions of his job with or without reasonable accommodation; and, (3) the employer took an adverse action against her on account of her disability.[4] *Young v. United Parcel Serv., Inc.*, 707 F.3d 437, 443 (4th Cir. 2013) (quoting 42 U.S.C. § 12112(a)).  The court will assume for purposes of this motion that the plaintiff can establish that she is a qualified individual with a disability.

The undersigned finds that the plaintiff cannot establish the third element of her *prima facie* case.  In the amended complaint, the plaintiff alleges that the defendant discriminated against her by "harassing her regarding the time she needed to take away from work and attempted to deter her from taking necessary leave because of her disability" (doc. 9, amend. comp. ¶ 34).  However, the evidence is clear that the alleged "harassment"

---

[4]The defendant cites *Perry v. Computer Sciences Corp.*, 429 F. App'x 218, 219-20 (4th Cir. 2011) for the proposition that the plaintiff must show as part of her *prima facie* case of disability discrimination that she was terminated "*solely* on the basis of [her] disability" (doc. 28-19, def. m.s.j. at 27) (emphasis added). The *Perry* case, in which the plaintiff alleged disability discrimination in violation of the ADA and the Rehabilitation Act, cited *Constantine v. Rectors & Visitors of George Mason Univ.*, 4111 F.3d 474, 498 (4th Cir. 2005) as support for its statement of the requirements of a *prima facie* case under either Act.  *Perry*, 429 F. App'x at 220.  However, the *Constantine* case makes clear that "[a]lthough '[t]he ADA and Rehabilitation Act generally are construed to impose the same requirements,' we have recognized that the causation standards under Title II of the ADA and § 504 of the Rehabilitation Act are 'significantly dissimilar.' A plaintiff seeking relief under Title II of the ADA must prove that disability 'played a motivating role' in the adverse action, while a plaintiff seeking relief under § 504 of the Rehabilitation Act must prove that the defendants' discriminatory conduct was 'solely by reason' of the plaintiff's disability." *Constantine*, 411 F.3d at 498 n.17 (quoting *Baird v. Rose*, 192 F.3d 462, 469-70 (4th Cir. 1999)). Here, the plaintiff alleges disability discrimination solely in violation of the ADA.  As the *Perry* case appears to set the evidentiary bar higher for establishing a *prima facie* case, the undersigned elects to analyze the case pursuant to the *prima facie* case set out in *Young*, 707 F.3d at 443.  *See Dotson v. Avon Products, Inc.*, C.A. No. 3:10-881-CMC-SVH, 2012 WL 3549768, at *2 (D.S.C. Aug. 16, 2012) (declining to use *Perry prima facie* evidence test).

consisted of Pittman and others holding the plaintiff accountable for attendance issues for which she admittedly had no approved FMLA leave (doc 28-1, pl. dep. 145, 197 & ex. 23, 32-33).  The ADA does not prohibit an employer from addressing performance issues, including attendance issues, with the employee.  *See Tyndall v. National Educ. Centers, Inc. of California*, 31 F.3d 209, 215 (4th Cir. 1994) ("The ADA does not discontinue the dialogue on problems such as substandard job performance or absence from work.").  In addition, Employee Relations Manager Bates, who is African-American and has lupus, reviewed the investigation into the plaintiff's alleged misconduct and agreed that immediate termination of employment was warranted (doc. 28-1, Bates dep. 43-44, 46).  *See, e.g., Grady v. Affiliated Cent., Inc.*, 130 F.3d 553 (2nd Cir. 1997) (stating that the fact the decisionmaker was one year older than plaintiff supported the conclusion that no age discrimination occurred).

Moreover, even if the plaintiff could establish a *prima facie* case of disability discrimination, she cannot show that the defendant's stated reasons for terminating her employment was pretext for disability discrimination for the same reasons discussed above with regard to her race claim. Accordingly, summary judgment should be granted on the plaintiff's disability discrimination claim.

To establish a *prima facie* case of retaliation under the ADA, a plaintiff must show that: (1) she has engaged in protected conduct; (2) "she suffered an adverse action subsequent to engaging in the protected conduct"; and (3) "there was a causal link between the protected activity and the adverse action." *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006). The ADA's retaliation provision only prohibits retaliation against a person because the person "opposed any act or practice made unlawful by this chapter" or "made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

In alleging retaliation under the ADA, the plaintiff claims that she reported "her supervisor's disability discrimination to Human Resources" and that the defendant retaliated by terminating her employment (doc. 9, amend. comp. ¶¶ 39-40). For purposes of this motion, the undersigned will assume that the plaintiff "engaged in protected conduct" when she complained to Bates regarding her treatment in September 2011. However, the plaintiff has failed to present evidence of a causal link between this complaint and her termination. The fact that the defendant believed multiple witnesses and its own records over the plaintiff in reaching the decision to terminate her employment following an investigation is not evidence of any discriminatory or retaliatory animus, even if the defendant's reliance was mistaken. *King v. Blanchard Mach. Co.*, C.A. No. 3:10-3219-MBS, 2012 WL 4586177, at *10 (D.S.C. Sept. 28, 2012) (dismissing plaintiff's ADA claim and finding the fact that defendant did not disregard the opinions of four of its employees does not by itself suggest discrimination even if the employer was mistaken). Moreover, as discussed above with regard to the plaintiff's race discrimination claim, the plaintiff has failed to show that the reasons given for her termination from employment were pretext for retaliation. Accordingly, summary judgment should be granted on the plaintiff's retaliation claim under the ADA.

**FMLA**

The plaintiff alleges that the defendant interfered with her substantive FMLA rights by harassing her, by discouraging her from taking approved FMLA leave, and by terminating her employment (doc. 9, amend. comp. ¶¶ 47-49). She further alleges that the defendant retaliated against her for complaining of FMLA issues by terminating her employment (*id.* ¶¶ 53-56).

To establish an FMLA interference claim, an employee must show that: "(1) [s]he was an eligible employee; (2) h[er] employer was covered by the Act; (3) [s]he was entitled to leave under the FMLA; (4) [s]he gave h[er] employer adequate notice of h[er]

intention to take leave; and (5) the employer denied h[er] FMLA benefits to which [s]he was entitled." *King*, 2012 WL 4586177, at *5 (citing *Rodriquez v. Smithfield Packing Co.*, 545 F. Supp. 2d 508, 516 (D. Md. 2008)).  As the Fourth Circuit has clarified, "[B]eing on FMLA leave does not provide an employee any greater rights than he or she would have had without taking leave . . . ." *Mercer*, 532 F. App'x at 396 (affirming the dismissal of plaintiff's FMLA interference claim where the employer terminated plaintiff after discovering performance issues while she was on FMLA leave).

In pleading her interference claim, the plaintiff does not allege that the defendant denied her FMLA benefits to which she was entitled as required by the fifth element of her claim. There is no dispute that, for the FMLA requests that Cigna denied, the denial was based on the fact that Cigna did not receive complete medical certifications from the plaintiff (doc. 28-1, pl. dep. ex. 19-20, 22-23). Accordingly, the FMLA's protections were not triggered. *See, e.g., Floyd v. Mgmt. Analysis & Utilization, Inc.*, C.A. No. 7:13-1971-MBS, 2014 WL 971937, at *5 (D.S.C. March 12, 2014) (dismissing plaintiff's interference claim and stating, "In summary, because Plaintiff did not submit when requested a certification supporting his request for FMLA leave, Defendant's duty to provide FMLA leave was never triggered, and Plaintiff was not entitled to protections under the FMLA.").

Instead, the plaintiff alleges that the defendant engaged in "harassment" of her and discouraged her from taking approved FMLA leave (doc. 9, amend. comp. ¶ 47). However, the testimony is clear that the alleged "harassment" was simply Pittman holding the plaintiff accountable for tardies and absences for which the plaintiff admittedly had no approved FMLA leave (doc. 28-1, pl. dep. 145, 197 & ex. 23, 32-33).

The plaintiff argues that "Pittman had an obligation pursuant to Defendant's policy to make every effort to assist Ms. Hill regarding Ms. Hill's attempts to get approval for medical leave under FMLA" (doc. 31, pl. resp. m.s.j. at 4).  She further argues in

response to the motion for summary judgment that her interference claim is based upon Pittman failing to direct her to contact Cigna[5] and choosing to "demean and harass" her by disciplining her (*id.* at 34-35). However, the plaintiff conceded in her deposition that she: understood the procedure for obtaining FMLA and admitted she had successfully utilized FMLA in the past (doc. 28-1, pl. dep. 47-48, 83, 108); understood that Cigna made the FMLA determinations (*id.* 82); understood that she was supposed to contact Cigna regarding any FMLA requests (*id.* 47-48); knew that she could access information regarding the status of her FMLA requests online or by otherwise contacting Cigna (*id.* 48); understood that, if she failed to provide additional information requested by Cigna, her FMLA requests would be denied (*id.* 82); and understood that, if she did not have approved FMLA leave, any attendance issue could be considered an occurrence and a violation of the defendant's attendance policy, resulting in disciplinary action up to and including termination (*id.* 79). The records and the plaintiff's testimony show she was in regular contact with Cigna by telephone and in writing and that she was well aware that her FMLA requests lacked necessary supporting documentation (*id.* 205, 254; doc. 33-5, Cigna correspondence). The plaintiff further conceded that all the disciplinary actions she received from Pittman involved attendance issues for dates during which she had no approved FMLA leave and she was, therefore, in violation of the defendant's attendance policy (doc. 28-1, pl. dep. 79, 145, 197).

Based upon the foregoing, summary judgment should be granted as to the FMLA interference claim.

------

[5]The pages from the plaintiff's deposition cited in the plaintiff's response brief do not support the assertion that "Pittman made no effort to inform [the plaintiff] she needed to contact Cigna as required by Defendant's Policy" (doc. 31, pl. resp. m.s.j. at 4 (citing doc. 31-9, pl. dep. 115-16 (wherein the plaintiff testified to the dates she was granted and denied FMLA leave)). Pittman testified in her deposition that there was no need for her to tell the plaintiff to contact Cigna because the plaintiff had already contacted Cigna (doc. 31-8, Pittman dep. 65-66). Pittman further testified that when the plaintiff was denied FMLA leave, she came to her, and Pittman informed her of what she needed to do and gave the plaintiff a form to take to her physician to get the required certification (*id.* 66).

With regard to the plaintiff's FMLA retaliation claim under 29 U.S.C. § 2615(a)(2), because such claims are analogous to Title VII retaliation claims, they can be analyzed under the *McDonnell Douglas* burden-shifting framework. *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir.2001). The plaintiff bears the burden of making a *prima facie* showing "that [s]he engaged in protected activity, that the employer took adverse action against h[er], and that the adverse action was causally connected to [her] protected activity." *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir.1998). If she makes this *prima facie* showing, then the defendant bears the burden of offering a nondiscriminatory explanation for its decision to terminate the plaintiff's employment, and, thereafter, the burden would return to the plaintiff to show that the defendant's' "proffered explanation is pretext for FMLA retaliation." *Nichols*, 251 F.3d at 502.  For the same reasons set forth above with regard to the plaintiff's ADA retaliation claim, the plaintiff's FMLA retaliation claim fails because she has not shown a causal connection between her alleged protected activity and her termination, and she has failed to show that the defendant's stated reasons for terminating her employment were a pretext for FMLA retaliation.  Accordingly, summary judgment is also appropriate on the plaintiff's FMLA retaliation claim.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, this court recommends that the defendant's motion for summary judgment (doc. 28) be granted.  Should the district court adopt this recommendation, the plaintiff's motion in limine (doc. 37) will be rendered moot.

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

January 30, 2015
Greenville, South Carolina

30